UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| PAUL BERRY III, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:16-CV-00508 JAR |
| | ) |
| JASON KANDER, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

This action is before the Court on Plaintiff's Motion for Temporary Restraining Order under Federal Rule of Civil Procedure 65. (Doc. No. 11) The Court heard oral arguments on April 29, 2016. For the following reasons, the motion will be denied.

### I.   Background and Hearing Information

Plaintiff originally filed this action for declaratory and injunctive relief on April 13, 2016, against Defendants Jason Kander in his official capacity as Missouri Secretary of State and Chris Koster in his official capacity as Missouri Attorney General challenging the current Missouri congressional district boundaries and alleging violations of Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments. (Doc. No. 1) In his pending motion filed April 26, 2016, Plaintiff seeks immediate injunctive relief prohibiting Defendant Kander from enforcing or giving any effect to the current Missouri congressional district boundaries or from performing election-related duties related to those boundaries.

Plaintiff, a resident and voter of Missouri Congressional District #2 ("MCD 2"), is also running as a candidate for office in Missouri Congressional District #1 ("MCD 1") election. He

1

asserts he has standing to bring the present action as a voter, as well as a candidate. He agreed to this Court's jurisdiction to preside over the present action, although he seeks appointment of a three-judge panel for ultimate resolution of this case.

In his presentation before this Court Plaintiff asserts that he believes that an injunction should issue to prohibit the use of the current congressional boundaries because the Missouri General Assembly has failed to redistrict after being given an opportunity to do so. Plaintiff states that he believes the current apportionment of the districts to be discriminatory, as they are neither "compact as they may be," nor are they racially proportionate. In fact, Plaintiff states that he believes that the congressional districts were ultimately apportioned with specific intent to stack, or sort, African Americans into specific congressional districts without a rational reason to do so, in violation of Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301(a).[1]

In support of his argument, Plaintiff has not presented any expert witnesses or fact witnesses who can testify to the apportionment process which occurred in 2010, as he has merely provided the Court with public records relating to the apportionment process as it passed through the General Assembly.[2] These records do not mention race, as Plaintiff himself noted.

As his only "evidence" of race <u>being used as a factor</u> in the apportionment process, Plaintiff points to the exhibits he has attached to his complaint, which he states

---

[1] In his complaint, Plaintiff asserts that "St. Louis County African American voters were almost exclusively 'packed' into current Missouri Congressional District One boundaries, which unconstitutionally dilutes and unnecessarily isolates virtually all of the St. Louis County African-American voter bloc from 'ballot-box' influence upon Congressional District Two, which represents both the economic engine and a majority of all congressional voters of St. Louis County, Congressional District Two."

[2] Plaintiff has filed the first page of House Bill 193 as Exhibit A. Exhibit B is a summary of the hearing relating to the final passage of the House Bill. Exhibit C is a House Journal. These exhibits do not show any mention of race as a factor during the apportionment process.

2

upon information and belief each Senate and House redistricting committee utilized race-based statistical evidence to establish current Missouri Congressional District One and Missouri Congressional District Two boundaries." Plaintiff states he received this information from the archives of the Missouri Office of Administration. Plaintiff relies on his Exhibit A, titled "Grand Compromise," which provides a breakdown of population between white, black and hispanic origin, into each of eight districts in Missouri. Plaintiff has presented no evidence as to whether this document was used to apportion congressional districts in 2010, or whether this document was produced <u>after</u> the apportionment of the districts in 2010. Plaintiff's only other "evidence" of racial gerrymandering presented at the hearing was his own calculations derived from the population and racial deviation found in Exhibit A, "Grand Compromise."

Plaintiff states he is in need of emergency relief because absentee ballots must be printed and available to military and overseas voters by June 17, 2016. Plaintiff believes using these ballots with the current district boundaries would violate the Voting Rights Act and the Equal Protection Clause. Plaintiff also believes he is in need of emergency relief because this lawsuit causes uncertainty of a sort that interferes with his ability to run an effective campaign and fundraise, as a candidate for congressional office. Plaintiff further believes his ability to vote for the candidate of his choice will be impaired.[3]

## II. Legal standard for Injunctive Relief

"Whether a preliminary injunction should issue involves consideration of (1) the threat of

---

[3] Plaintiff's argument is unclear. In his complaint and motion for temporary restraining order, plaintiff makes the a very different argument. He states that "due to the General Assembly unconstitutionally utilizing race to establish current Missouri Congressional District One boundaries, virtually the entire African American congressional voter bloc residing within St. Louis County is currently isolated from Missouri Congressional District Two boundaries, which represents the majority of the entire Saint Louis County congressional voter bloc."

3

irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 113 (8th Cir. 1981). "In balancing the equities no single factor is determinative." *Id.* These factors are also considered to determine the propriety of a temporary restraining order. *See S.B. McLaughlin & Co., Ltd. v. Tudor Oaks Condo. Project,* 877 F.2d 707, 708 (8th Cir. 1989).

The relevant inquiry is "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase,* 640 F.2d at 113. The burden of proof is on the party seeking injunctive relief. *Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 418 (8th Cir. 1987); *United States v. Dorgan,* 522 F.2d 969, 973 (8th Cir. 1975).

### A. Plaintiff's Allegations Within His Complaint

Plaintiff alleges three claims against defendants: (1) the Missouri Congressional Map is not as "compact as may be";[4] (2) defendants acted with specific intent to discriminate against African Americans when they racially sorted the Congressional Districts MCD 1 and MCD 2, which had the effect of diluting the black vote in MCD 2, in violation of the Equal Protection Clause; (3) defendants violated Section 2 of the Voting Rights Act when they affirmatively sorted African Americans into specific Congressional Districts.

### B. Legal Review of Racial Gerrymandering Claims

All three of the counts contained in Plaintiff's complaint seem to intertwine into one large

---

[4]Defendants assert that this matter has already been reviewed by the Supreme Court of Missouri in *Pearson v. Koster,* 367 S.W.3d 36 (2012), and that this Court must give deference to the decision previously made by that Court.

4

allegation of racial gerrymandering. The Supreme Court has recognized two types of racial gerrymandering claims under the Fourteenth Amendment: (1) claims of racial vote dilution, where the redistricting legislation is "conceived or operated as [a] purposeful devic[e] to further racial discrimination by minimizing, canceling out or diluting the voting strength of racial elements in the voting population," *Rogers v. Lodge,* 458 U.S. 613, 617 (1982) (internal quotation marks omitted); and (2) claims of racial sorting, where the redistricting legislation, "though race neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification," *Shaw v. Reno (Shaw I),* 509 U.S. 630, 649 (1993).

In a constitutional racial vote dilution case, the plaintiff must show that the State has placed a burden upon the right to vote by intentionally establishing or maintaining devices or procedures that cause minority citizens to have less opportunity than other citizens to participate in the political processes and to elect legislators of their choice. This dilutes the minority voter's ability to exercise the "full and effective" right to vote. *Rogers v. Lodge,* 458 U.S. 613, 617 (1982).

The other strand of "racial gerrymandering"—a racial sorting claim such as the one presented in this case—is "analytically distinct" from a vote dilution claim. *Miller v. Johnson,* 515 U.S. 900, 911 (1995). "Whereas a vote dilution claim alleges that the State has enacted a ... purposeful device 'to minimize or cancel out the voting potential of racial or ethnic minorities,' ... the essence of [a racial sorting claim] is that the State has used race as a basis for separating voters into districts." *Id.* (internal citations omitted).

In order to prove a racial sorting claim, a plaintiff must show that the legislature

"subordinated" traditional race-neutral districting principles in crafting the district's boundaries:

> The plaintiff's *burden* is *to show,* either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district. To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations.

*Miller,* 515 U.S. at 916. This threshold standard is "a demanding one." Indeed, the plaintiff must overcome a presumption that the legislature acted correctly and in good faith. *Id.* Thus, the plaintiff "must show that the State has relied on race in substantial disregard of customary and traditional districting practices." *Id.* at 928.

In addition to these constitutional imperatives, redistricting legislation must also comply with the VRA. "The Voting Rights Act was designed by Congress to banish the blight of racial discrimination in voting [.]" *South Carolina v. Katzenbach,* 383 U.S. 301, 308, (1966) *abrogated by Shelby Cnty., Ala. v. Holder,* —— U.S. ——, 133 S.Ct. 2612, (2013). Enacted pursuant to Congress' enforcement powers under the Fifteenth Amendment, *see Shelby Cnty.,* 133 S.Ct. at 2619–21, the VRA prohibits states from adopting plans that would result in vote dilution under Section 2 or—in covered jurisdictions—retrogression under Section 5.[5]

In order to prove a § 2 violation, a plaintiff must satisfy three prerequisites: compactness, political cohesiveness, and bloc voting. "First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Thornburg v. Gingles,* 478 U.S. 30, 50 (1986). "Second, the minority group

---

[5]In *Shelby County,* the Supreme Court struck down the coverage formula in Section 4, thereby drawing into question the status of covered jurisdictions, Section 5 compliance obligations until such time that Congress enacts a new coverage formula. 133 S. Ct. at 2631.

6

must be able to show that it is politically cohesive." *Id.* at 51. "Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Id.* These final two factors are often referred to collectively as "racial polarization." Once these prerequisites have been satisfied, the court evaluates the plaintiff's evidence based on the totality of the circumstances. The totality of circumstances must be considered with a focus on whether the minority group in question was denied "equal political opportunity." *Johnson v. De Grandy,* 512 U.S. 997, 1014 (1994).

### III. Dataphase factors

#### A. Likelihood of Success on the Merits

Plaintiff's arguments for racial gerrymandering seem to be a mix of racial sorting and racial dilution. On one hand, Plaintiff asserts that defendants acted with specific intent to racially discriminate against African Americans by sorting African American voters into specific districts, in violation of both the Equal Protection Clause and the Voting Rights Act. However, he admits he has no evidence that there was any mention of racial discrimination during the culmination of the apportionment plan, which became House Bill 193, and eventually resulted in the Grand Compromise.

Rather, Plaintiff points to the racial make-up of Districts 1 and 2 after the apportionment, and he states that this is enough evidence, in and of itself, as shown by his exhibits attached to his complaint, of specific discrimination to allow this Court to enter a temporary restraining order mandating that a hold be placed on all ballots going out, and the Secretary of State stop all election duties. Plaintiff has presented no competent evidence for the Court to find a likelihood

7

of success on his claims at this juncture. Moreover, his assertions are simply too circumstantial to imperil and perhaps permanently delay the important voting procedures that Plaintiff, himself, recognizes are central to our voting rights under the United States Constitution.

### B. Irreparable Injury

Although Plaintiff claims he will suffer irreparable injury if the Court does not grant him a mandatory restraining order, he has not clearly articulated for this Court exactly what his injury will be. It appears based on his statements that his difficulties with campaigning and fundraising have been caused, in large part, by uncertainty which is the direct result of his filing this lawsuit. In addition Plaintiff cannot claim as much harm to his own chances as a candidate, as he has chosen to run in District 2, the voting district he claims to be least affected by the alleged apportionment difficulties. While Plaintiff may have some arguable injury as a voter in District 1, his injury as one voter in the upcoming August 2016 election must be weighed against the harm to the public, as a whole, who will be participating in the same election.

### C. Harm/Public Interest

Defendants state that there would be substantial harm to the public if the Court would prevent the Secretary of State from going forward with the elections. Essentially, the military and absentee voters would not be able to receive ballots as of June 17, 2016, and no congressional primary could occur as of August 7, 2016. Moreover, if no ballots could be printed by the Secretary of State, no elections could be held, for either the upcoming congressional elections, or the presidential elections in November of 2016.

Defendants further counter that if the Court granted Plaintiff's motion for injunctive relief and made a finding, essentially, that there was racial gerrymandering in violation of the law,

8

there would be no time to draw new congressional districts prior to the August elections and either a special session of the Missouri Legislature would have to be called to draw new districts or a special election would have to be called after new districts were drawn. All of these things would impede on Missourians' rights to vote, as well as cost the taxpayers money. It is unlikely a special election could even occur before January when the new Congress is sworn, thus leaving the area unrepresented. When the Court considers all of these possibilities, the potential harm to the public outweighs any harm to the Plaintiff. In sum, the Court having considered all of the *Dataphase* factors, finds that the request for temporary restraining order should be denied.

With regard to Plaintiff's request for an expedited docketing and hearing schedule, the Court finds Plaintiff's expedited plan (*see* Doc. No. 12-1) is not feasible. The Court will, therefore, order each side to submit a proposed scheduling plan for its consideration.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Temporary Restraining Order [11] is **DENIED**.

**IT IS FURTHER ORDERED** that the parties shall each submit a reasonable proposed scheduling plan, keeping in mind the timeline for the 2016 election, no later than **Wednesday, May 4, 2016**.

**IT IS FURTHER ORDERED** that in light of the hearing held today and the rulings on the record, Plaintiff's Motion for Expedited Hearing and Emergency Motions [7] is **DENIED** as moot.

Dated this 2nd day of May, 2016.

JOHN A. ROSS
UNITED STATES DISTRICT JUDGE

9