UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| PAUL BERRY III, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:16-CV-00508 JAR |
| ) | |
| JASON KANDER, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER

Plaintiff originally filed this action for declaratory and injunctive relief on April 13, 2016, against Defendants Jason Kander in his official capacity as Missouri Secretary of State, and Chris Koster in his official capacity as Missouri Attorney General, challenging the current Missouri congressional district boundaries and alleging violations of Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments. (Doc. No. 1) An amended complaint was filed, albeit without leave, on May 9, 2016. (Doc. No. 21)

On April 26, 2016, Plaintiff filed a motion for temporary restraining order seeking immediate injunctive relief prohibiting Defendant Kander from enforcing or giving any effect to the current Missouri congressional district boundaries or conducting any elections based on those boundaries. (Doc. No. 11) The Court set the motion for hearing on April 29, 2016. (Doc. No. 13) Plaintiff agreed to this Court's jurisdiction, although he seeks appointment of a three-judge panel for ultimate resolution of this case.[1]

On May 2, 2016, the Court denied Plaintiff's motion for temporary restraining order.

---

[1] Any final determination on the merits will require a three-judge panel. See Shapiro v. McManus, 136 S. Ct. 450 (2015).

1

(Doc. No. 17) At Plaintiff's request, the Court then entered an expedited scheduling order and set this matter for hearing on Plaintiff's petition for injunctive relief on June 2, 2016. (Doc. No. 20) Defendants filed an answer to the amended complaint on May 23, 2016 (Doc. No. 22) and a prehearing memorandum on June 1, 2016 (Doc. No. 24). With the agreement of the parties, the Court incorporated the record from the April 29, 2016 hearing on Plaintiff's motion for temporary restraining order.

**Plaintiff's Claims**

In Counts I and II of the amended complaint, Plaintiff alleges race was used in the creation of Missouri Congressional Districts One and Two, in 2011, in violation of the Equal Protection Clause of the United States Constitution and the Missouri Constitution. In Count III, Plaintiff alleges that race was a predominant factor in the creation of Missouri Congressional Districts One and Two, in 2011, in violation of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10301(a). As noted in the Court's prior Memorandum and Order, dated May 2, 2016, Plaintiff has interwoven his allegations into one large "racial gerrymandering" argument before this Court. It appears the "racial gerrymandering" claims fall within two distinct categories: a racial sorting/packing claim and a racial dilution claim.

In a racial gerrymandering case, the "plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." Miller v. Johnson, 515 U.S. 900, 911-12 (1995). "To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to

compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations." Id. Public statements, submissions, and sworn testimony by the individuals involved in the redistricting process are not only relevant but often highly probative. See, e.g., Bush v. Vera, 517 U.S. 952, 960-61 (1996) (examining the state's preclearance submission to the Department of Justice and the testimony of state officials). Once a plaintiff establishes race as the predominant factor, the Court applies strict scrutiny, and "the State must demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest." Miller, 515 U.S. at 920. If race did not predominate, then only rational-basis review applies.

**Legal Standard**

To determine whether injunctive relief is warranted, the Court must balance the threat of irreparable harm to movant, the potential harm to the nonmoving party should an injunction issue, the likelihood of success on the merits, and the public interest. Dataphase Sys. v. CL Sys., 640 F.2d 109, 113-14 (8th Cir. 1981) (en banc). Injunctive relief is an extraordinary remedy, and the burden of establishing the propriety of such relief is on the movant. Watkins, Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003) (citations omitted). "The party seeking injunctive relief bears the burden of proving all the Dataphase factors." Id.

**Evidence at hearing[2]**

As noted above, this is the second time Plaintiff has appeared before this Court seeking to

---

[2] The Court notes that in his amended complaint, Plaintiff challenges the creation of Missouri Congressional Districts One, Two and Three, and "the entire Missouri Congressional District Map." (AC at ¶¶ 156, 162, 165, 166, 167, 170-73, 176) Plaintiff must present statewide evidence in order to prove racial gerrymandering in a particular district or evidence as to every individual district. Alabama Legislative Black Caucus v. Alabama, 136 S. Ct. 1257, 1265 (2015).

stop the 2016 Missouri general elections, which are set to occur on November 8, 2016. Although Plaintiff requested and was given an expedited discovery schedule, he has produced no testimony regarding the instructions given to those tasked with creating the congressional district boundaries ultimately enacted. Plaintiff has produced no expert testimony regarding: (1) population density studies of the Congressional Districts; (2) the exact racial make-ups of the Congressional Districts' citizens; (3) the divisions of populations within the districts, themselves; (4) the natural boundary lines of the Congressional Districts One and Two; (5) the boundaries of political subdivisions, including how these boundaries fall within the county lines, themselves, as well as the municipalities and precincts; (6) and the historical boundary lines of the prior redistricting maps. See, e.g., Pearson v. Koster, 367 S.W.3d 36, 50-51 (Mo. 2012) (en banc) (finding that the compactness requirement implicitly requires the legislature to comply in the redistricting process with federal laws and to consider the aforementioned factors); Bush v. Vera, 517 U.S. 952, 963 (1996).

Plaintiff has also failed to submit any documentary evidence showing there was a specific or general intent to engage in race discrimination during the districting process.[3] In fact, at the hearing on this matter, Plaintiff was granted leave to submit an 800-page exhibit consisting of notes, hearing minutes and witness statements related to the 2011 redistricting process from the archives of the Missouri State Department of Administration for the sole purpose of demonstrating the absence of any reference to race in the record.[4] Plaintiff argues the absence of

---

[3] The Solicitor General suggests that political and incumbency considerations were the motivation for drawing the congressional district boundaries back in 2011. See Pearson v. Koster, 367 S.W.3d 36 (Mo. 2012). In any event, the Court notes there is no evidence on the record to support this alternate theory.

[4] To date, Plaintiff has still not submitted a copy of this exhibit for the record.

any reference to race in these records demonstrates there was no "strong basis in evidence" for drawing the current district boundaries under Bush v. Vera, 517 U.S. at 978-79. From these archived documents, Plaintiff also references a letter from then County Executive Charlie Dooley, apparently to show the General Assembly was under the belief that it had to consider and use race when undertaking the redistricting process. Plaintiff did not, however, provide the Court with a copy of this letter and the Court was unable to determine to whom the letter was sent, when it was written, and what the letter was in reference to.[5]

Plaintiff also points to data sets with racial breakdowns of voters that were created and provided to the legislature for use in creating district maps to show that race was the predominant factor in the redistricting process. The data set was developed by the Redistricting Office staff by taking the 2010 census data and dividing residents into two groups - "white alone-non-Hispanic" and all others, labeled "minority." (See Affidavit of Matthew B. Hessner, Plaintiff's Exhibit D) According to the Solicitor General, the dataset is merely a breakdown of the population in a broad sense and in no way establishes that race was a predominant factor in drawing the district lines.

**Dataphase factors**

**Likelihood of Success on the Merits**

In Miller, the Court described the plaintiffs' burden as follows:

The plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district. To make this showing, *a plaintiff*

---

[5] It is not the Court's burden to piece through Plaintiff's voluminous exhibit in order to attempt to make Plaintiff's case for him. Plaintiff has the burden in his request for injunctive relief.

> *must prove that the legislature subordinated traditional race-neutral districting principles,* including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations.

515 U.S. at 916. (emphasis added). The fact that a district deviates from neutral criteria on its face does not, however, mean those deviations were racially motivated. Other, non-racial districting criteria may also be used to defeat a claim of racial gerrymandering by demonstrating that the district's deviations from neutral criteria are attributable to *race*-neutral motives. Chief among these are political and incumbency considerations. See Alabama Legislative Black Caucus v. Alabama, -- U.S. --, 135 S. Ct. 1257, 1270 (2015). Plaintiff has not produced any direct or circumstantial evidence that anyone related to the redistricting process used race as a non-negotiable criterion or that traditional redistricting principles were subordinated to race. Id. On this record, Plaintiff is unlikely to succeed on the merits of his claims of racial gerrymandering.

In the same way, Plaintiff is unlikely to succeed on the merits of his VRA claim. Plaintiff points to the absence of any reference to race in the General Assembly's records and argues it is a violation of Section 2 of the VRA to "consider race" in redistricting, at all, without some evidence of racial bias in one's state.[6] Plaintiff has taken somewhat conflicting positions in this case, but in any event has not directed the Court to any statutory or case law in support of his argument.

Section 2 of the VRA prohibits the imposition of any electoral practice or procedure that

---

[6] Plaintiff stated that he believed there was "evidence" that the General Assembly "considered race" because somewhere in the 800 pages of Exhibit E there were data sets that included race, and maps provided to the Missouri Department of Administration that included race statistics. He has not, however, presented evidence of what the "racial floor" allegedly was, or how "race" was used in "packing" a congressional district.

"results in a denial or abridgement of the right of any citizen … to vote on account of race or color…" 52 U.S.C. § 10301(a). A Section 2 violation occurs when, based on the totality of circumstances, the political process results in minority "members hav[ing] less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

The Supreme Court has identified three threshold conditions for establishing a Section 2 violation: (1) the racial group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the racial/minority group is politically cohesive; and (3) the majority votes sufficiently as a bloc to enable it, usually to defeat the minority's preferred candidate. Johnson v. DeGrandy, 512 U.S. 997, 1006-07 (1994). These are the so-called Gingles requirements. See Thornburg v. Gingles, 478 U.S. 30, 50-51 (1986).[7] As noted above, Plaintiff has not presented any testimony from fact witnesses regarding the redistricting process or any expert testimony on *inter alia*, population density, racial make-up and the boundary lines of MDC 1 and 2 to satisfy the Gingles requirements. Even by Plaintiff's own argument, there is no evidence of any voting bloc; the current congressional representative in MCD 1 has won election and reelection by a large majority exceeding the numbers of any single group. Thus, the Court cannot agree with Plaintiff that he has met his burden of establishing a violation of Section 2 of the VRA.

For these reasons, the Court finds Plaintiff has presented no competent evidence for the Court to find a likelihood of success on his claims at this juncture. Moreover, his assertions are

---

[7] If all three Gingles requirements are established, the statutory text directs the Court to consider the "totality of the circumstances" to determine whether members of a racial group have less opportunity than do other members of the electorate. DeGrandy, 512 U.S. at 1011-12.

simply too tenuous to imperil and perhaps permanently delay the important voting procedures that Plaintiff himself recognizes are central to voting rights under the United States Constitution.

**Harm/Public Interest/Irreparable Injury**

As noted above, Plaintiff is seeking the same relief he sought in the prior hearing before this Court - he seeks a disruption in the ballot process until such time as a new district map can be drawn.[8] Thus, Plaintiff is essentially asking that a new map be drawn before the August 2016 congressional elections, something this Court believes cannot be accomplished in less than two months. Alternatively, Plaintiff is requesting an injunction against the entirety of the August 2016 congressional elections, and perhaps, the November 2016 presidential election. The possibility of harm to the citizens of Missouri through loss of their right to vote is a significant one and is not taken lightly by this Court, particularly since Plaintiff has failed, on this record, to present evidence of racial gerrymandering.

There is an established statutory and regulatory procedure behind the electoral process in Missouri. See Mo. Rev. Stat. § 115.121. There are certain deadlines by which absentee ballots must be made available.[9] See Mo. Rev. Stat. §§ 115.281 and 115.914; see also, 52 U.S. § 20302(a)(2). Additionally, local election officials must have time to print ballots, so they must have a correct list of candidates for each Congressional District 10 weeks prior to the election. See Mo. Rev. Stat. § 115.125.1. In order to certify that list of candidates, the primary election

---

[8]The Court notes that Plaintiff is seeking a new redistricting process, or new district map for all of the State of Missouri, even though he is only contending that MCD 1 and MCD 2 are in violation of the VRA and the Equal Protection Clause.

[9] Under Missouri law, enacted in conjunction with federal law, absentee ballots must be generally available six weeks before the election, and 45 days before the election for military voters. For the November election, that means that absentee ballots must be printed and generally available by September 27, 2016, but available to military voters by September 23, 2016.

process must have been completed. This process, then, means that such absentee ballots must be printed and made available to military voters and overseas voters by June 17, 2016. See Mo. Rev. Stat. § 115.914. Although the Court has not made a finding that Plaintiff's request for relief is barred by laches, the Court is troubled that Plaintiff waited until four months before the Congressional election and seven months before the general election to file this action.

The Court notes that Plaintiff could have moved to intervene in Pearson to challenge the 2011 Congressional Redistricting Plan. He could also have filed this action at any point in the intervening years. Although Plaintiff states he did not decide to run as a candidate in the Congressional election until recently, when he first became aware of "new law" relating to racial gerrymandering, i.e., Shelby Cnty., Ala. v. Holder, -- U.S. --, 133 S. Ct. 2612 (2013), the Court must weigh this fact when determining his injury versus the harm to the public.

As the Court understands Plaintiff's arguments and his amended complaint, he has filed to run for a Congressional Seat in MCD 1. However, he resides and is registered to vote in MCD 2. Plaintiff believes, based on his own statements at the hearing, that the African American votes in MCD 2 have been diluted, and he believes the voting bloc for African Americans in MCD 1, and for him especially, will not be as strong as he is hoping. Any risk of harm to Plaintiff's candidacy is perhaps temporary, as he can certainly run for Congress again if he is not elected in this cycle. See Clements v. Fashing, 457 U.S. 957, 967 (1982) (waiting period is hardly a significant barrier to candidacy); see also, Stiles v. Blunt, 912 F.2d 260, 265-66 (8th Cir. 1990). As a voter, Plaintiff has no greater harm than any other voter in the District. In the absence of evidence, the Court finds that the greater harm lies in casting doubt on and imperiling the upcoming election.

**Conclusion**

Plaintiff has presented no evidence of any kind to support his contention that race was the predominant factor in the 2011 congressional redistricting process. Thus, there is no basis for granting any preliminary relief in this case. The Court concludes this case should proceed on the merits as any other and will assign it to a Track 2 Case Management Track.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's request for injunctive relief is **DENIED**.

**IT IS FURTHER ORDERED** that this matter will be set for a Rule 16 scheduling conference by separate order.

Dated this 7th day of June, 2016.

**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**